Charles M. TAYLOR et ux., Appellants,

v.

CITY OF AUSTIN, Appellee.

No. 10323.

Court of Civil Appeals of Texas.

Austin.

May 23, 1956.

Rehearing Denied June 13, 1956.

Tisinger & Sloan, Austin, for appellants.

Doren R. Eskew, City Atty., Austin, Clifton E. Speir, Asst. City Atty., Austin, for appellee.

HUGHES, Justice.

This is a condemnation proceeding brought by the City of Austin against Mr. and Mrs. Charles M. Taylor. The City sought to condemn the former residence of appellants located at 1013 Harper Lane in the City of Austin for the purpose of constructing what is known as the "Interregional Highway" being a highway and freeway traversing the City from north to south.

Special Commissioners appointed by the court to assess the damages occasioned by the condemnation of such property awarded appellants $11,150, which sum appellants, as authorized by law, have withdrawn from the court's registry.

All parties objected to the award made by the Commissioners and upon trial to a jury in the court below damages were assessed in the sum of $11,000. An appropriate judgment was entered from which Mr. and Mrs. Taylor appeal.

Appellants concede the insufficiency of the record to sustain their first and sec-

ond points and we pass to their third point which we quote:

> "Repeated and continuous charges by the City Attorneys, that defendants' attorneys were unethical and were guilty of sharp practices, particularly in view of continued and frequent and erroneous rulings in favor of the City of Austin, by the trial court, caused the rendition of an improper and inadequate verdict and the trial court erred in holding to the contrary."

To sustain this point appellants make five references to the record. The first reference shows that when the witness Sam Platt was being interrogated about market value of the property and the definition of that term the following occurred:

"Questions by Mr. Eskew:

"Q. Mr. Tisinger read to you back in the spring out of this book.

"Mr. Tisinger: No, sir, I didn't read to him out of that book.

"Q. That book, dated April 3, 1954?

"Mr. Tisinger: He is now trying to confuse his own witness.

"Mr. Eskew: I am trying to demonstrate to the jury and the Court that the trick that has been played was an unfair one.

"Mr. Tisinger: I resent the word 'trick.' I read to him the same definition. You know I did. You have a verbatim transcript of the record. You know that book was not printed but was only typewritten.

"Mr. Eskew: Of course, it wasn't. The witness was led to believe that he was read to from that book.

"Mr. Tisinger: No. Sam, you didn't understand me to say that I read to you from that same book, did you? The only thing I asked you was, did I read to you today like I did then.

"Q. (By Mr. Eskew) Did Mr. Tisinger furnish you a printed copy of

what he had read to you, Sam? Did he furnish it to you before you went out and looked at that property? A. I don't think so.

"Q. Did he read that definition to you before you went out and looked at that property in those exact words? A. I don't think he read that to me that day. We just went out there and looked at the property.

"Q. And you didn't have that definition before you at the time you went out there and looked at that property, did you? A. No, sir. Later on he read that to me.

"Mr. Eskew: Pass the witness."

The second reference reflects the following:

"The Court: I am trying to get whether you understood counsel's question or not.

"A. It was something in the future they could get.

"The Court: I was wondering if the witness understood the question or not.

"Mr. Tisinger: I don't know, Your Honor. I have asked him two or three times about it, but my last question was simple. It was simply, did you tell me that day when we went out there that the people ought to have $13,500?

"Mr. Eskew: That is a very inflammatory, improper statement of counsel.

"The Court: I will sustain the objection.

"Mr. Tisinger: Note our exception. It is offered as a part of the cross examination of a witness called by him, when he was on the property. That is all the questions I have."

Third, appellants were attempting to prove admissible certain photographs and failing in this the following occurred:

"Mr. Tisinger: I withdraw our exhibit. And I will state to the Court

and the jury that we will go back and take a half-dozen pictures.

"Mr. Eskew: Your Honor, the remarks of the witness—in our opinion it is unfair; it is unethical—unsworn statements; we respectfully request counsel to desist from making statements. If he continues to do so, he will be held in contempt.

"Mr. Tisinger: Now, I was trying to cross examine his own witness. Now Your Honor permits him to take him on voir dire and he says that portion doesn't look like the back yard. I am trying to get this case moving. And I am trying to sincerely. I try to deal fairly, but I do object to counsel stopping me.

"Mr. Eskew: This is an inflammatory address to the jury, Your Honor, which we object to.

"The Court: Let's move along, gentlemen.

"Mr. Tisinger: Yes, sir."

The fourth record reference reflects the following:

"Mr. Speir: May it please the Court, we object to counsel *tending* this to the jury without it being offered in evidence.

"Mr. Tisinger: I now offer it. Excuse me.

"Mr. Speir: We want to make an objection.

"Mr. Tisinger: You made the objection this morning—excuse me. I apologize.

"Mr. Speir: I will ask the Court to instruct counsel, please, to abide by the usual procedure and tender us at least the courtesy of looking at it before tendering it to the jury.

"Mr. Tisinger: He is correct, Your Honor. I made a mistake. I am sorry."

The last reference shows:

"Mr. Tisinger:

"Q. I will hand you Defendants' Exhibit 17, 16, 15, 19, and 18, and ask you if they show the character of use being made of the property?

"Mr. Eskew: These are photographs which have been identified before; we have both seen them. We object to that introduction, and we object to further discussion of them.

"Mr. Tisinger: Well, I haven't proved them up yet, Judge.

"Mr. Eskew: We both know what they are.

"The Court: They are not some that were introduced yesterday or the day before?

"Mr. Eskew: They are some that were exhibited to the jury without being introduced.

"Mr. Tisinger: I don't think I exhibited them to the jury.

"Mr. Eskew: Well, they were handed around and laid over on the table."

The testimony in this case consumes 471 pages of the statement of facts and was five days in its taking.

We have carefully examined the statement of facts and have carefully read all colloquies between counsel and between counsel and the court and for a hard fought case, as this case was, we find that the trial was conducted with perfect decorum by the trial judge and with the utmost fairness and impartiality and with a minimum of by-play between counsel.

Many trivial objections such as "leading the witness", "repetition", and "immaterial" were ruled upon for and against both sides and no complaint is brought forward as to such rulings. Specific points are made as to evidentiary matters which will be treated later in the opinion and each such point will be disposed of as the law requires and not upon the false premise that they import an unfair trial.

Aside from the instances detailed above we find that counsel treated each other with the utmost respect and courtesy. Many apologies are in the record when misunderstandings occurred. Counsel frequently, in the presence of the jury, stipulated as to various matters thus avoiding the trouble and necessity of producing proof. It is our experience that counsel who stipulate with each other are not personally very hostile to each other.

It is our opinion that there is nothing in the record to warrant the conclusion that appellants were prejudiced by the manner in which this trial was conducted or by unseemly remarks of opposing counsel.

■ The fourth point is that the trial court erred in refusing to admit evidence that there was an increment to the value of the property in suit due to general knowledge in the community that construction of the Interregional Highway was in contemplation of the authorities, the increase in value sought to be shown being *prior* to official action in the matter by the City.

Appellants contend that this evidence was admissible under the authority of the City of Dallas v. Shackelford, 145 Tex. 528, 199 S.W.2d 503.

This question arose during appellants' cross examination of the City's appraiser witness Ben E. King. In proving their Bill of Exceptions the record shows the following:

"Q. You recognize, of course, that the Interregional Highway was a thing back on the ground in the north limits of the City of Austin as early as 1950 or 1951; is that true? A. Yes, sir.

"Q. Perhaps not in its complete state, at least was being worked on? A. Yes, sir.

"Q. And it was well known to all informed people in the real estate circles that the Interregional Highway was headed south? A. Yes, sir.

"Q. And as far back as 1950 or 1951 you recognize that it had not been definitely announced at least by any legislative determination that the Interregional would cross the river? A. I don't think it had.

"Q. But it was as a practical matter among people in the real estate circles considered that it probably would? A. Was anticipated that it would.

"Q. That knowledge at any point and time after it became generally recognized that there was a probability that it would cross the river tended to increase and enhance the value of property in the south area to some degree generally, did it not? A. Yes, sir.

"Q. As the Interregional itself on the ground and public knowledge, the public continued to consider the fact that the Interregional would probably cross the river, you recognized that as early as 1951, that property across the river in the way of the apparent direction of the Interregional, that is, within the apparent vicinity of its probable future right-of-way would be enhanced in value by reason of that knowledge?

\*    \*    \*    \*    \*    \*

"A. Yes, sir, would have any influence on the property in the proximity or in the vicinity of the Interregional Highway—would have some added increment of value by virtue of the fact that the Interregional Highway might cross the river and be headed in their direction. I believe I have answered your question.

"Q. Yes, I think you have. In so far as there was an increment of value attached solely because of the possibility that that particular property might be condemned, you did not consider that increment in giving your value, did you? A. If I understand your question correctly, I did not consider added increment of value to that specific piece of property contrary to properties in general in that area by virtue

of the fact that it might be physically necessary to route the Interregional over that property.

"Q. You did consider, if I understand our many conversations on this subject, the general enhancement that might be attributed to the general area, whatever that is, caused by the proposition that the Interregional was expected to come somewhere through the eastern half of South Austin? A. Go through what?

"Q. The eastern half of South Austin. A. Yes, sir, because the area did in the minds of the market improve by virtue of this proposed right-of-way, which would give them a better street pattern and better conveniences."

We do not believe the error, if any, in not permitting appellants to develop the above testimony before the jury was injurious to them. It appears to us that Mr. King did consider the element of value thought proper by appellants. If the jury had in mind this element of value and not knowing whether Mr. King had considered it in his appraisal it seems to us that the jury would have been inclined to raise his figure, not reduce it. We see no harm to appellants.

■ Point five is that the following shows a comment by the trial judge on the weight of the evidence:

"Q. Now, this property that sold, you say, January, 1951, for $11,000, didn't have any big trees on it? A. No, sir, it didn't have any big trees on it.

"Q. Well, if it was worth $11,000, in January, 1951, Mr. King, how much was it worth in April, 1954?

"Mr. Eskew: Your Honor, counsel has asked this question twice already,
\*    \*    \*

"Mr. Tisinger: I did not ask that question previously. If the Court please, I asked the witness before if he knew the value. This question—I asked him to assume the figures he got

from the tax records was correct, what would the figure be in 1954? And the witness stated he did not know. I am asking him now to use his own figure, letting him assume that it was a true figure. I would like to cross examine this witness, Your Honor.

"Mr. Eskew: * * * repeatedly asking the same question.

"Mr. Tisinger: I thought I had explained that I had not.

"The Court: Objection will be sustained.

"Mr. Tisinger: I will ask the Court to let me take a bill, because I had not asked that question before. I except to the Court's ruling as a comment on the evidence.

"The Court: You mean this last one?

"Mr. Tisinger: Yes, sir, because I had not asked that question before."

In every instance where the trial court rules he, at least, infers that one party is right and the other wrong about the matter presented. We know of no way in which this inference may be avoided. It would be impossible to conduct most trials if appellants are correct. We do not think they are and the point is overruled.

The next five points are grouped for briefing and we will follow the same pattern, although the points relate to different matters.

■ Appellants sought to prove that a City witness who had testified to a value of $9,350 had, prior to the trial, made a statement that appellants "ought to have $13,500.00."

"Ought to have" value is not the legal criterion and this evidence was not admissible. If the circumstances showed that by the expression used market value was intended our ruling might be different.

■ The court excluded certain pictures of the interior of appellants' home. The prominent features of these photographs were the furniture, not the house.

The furniture shown was not being taken and there were other pictures of the home's interior taken after the furniture had been moved out. There was no error here, at least none of any consequence.

■ We have read the evidence regarding trees, plants and shrubbery on the property and in our opinion appellants were given full opportunity to assess their value as a part of the land, the proper method. Texas & St. Louis R. Co. v. Matthews, 60 Tex. 215; Forth Worth & D. S. P. R. R. Co. v. Gilmore, Tex.Civ.App., Amarillo, 2 S.W.2d 543.

■ Appellants claim that they were not allowed to fully develop the cost of planting, raising and caring for this growth on the property. If error it is of little harm as upkeep costs usually tend to diminish rather than enhance value. The cost of planting does add to the in place value but the witnesses, as we understand them, had this value in mind when testifying. If not the harm, if any, in excluding these cost details does not warrant reversal of this well tried case. Their possible impact on the gross value of the property is negligible.

■ Appellants complain that they were denied the right to offer testimony that their personal property might be depreciated in value by being transported to another location and as to the costs of transportation.

A motion to suppress this character of evidence was filed by the City. No formal order on the motion appears in the transcript although the statement of facts indicates that the court, upon agreement of all counsel, ruled such evidence inadmissible. No evidence of this nature was offered by appellants and we are of the opinion that appellants have no right now to complain of the court's ruling.

■ The last assignment is that the judgment is inadequate.

The eight lines devoted to arguing this point state, in effect, that the evidence, none of which is set out, summarized or specifically referred to, shows the verdict to be inadequate.

Six witnesses gave estimates ranging from $18,000 to $9,150. The point is overruled.

No reversible error appearing the judgment of the trial court is affirmed.

Affirmed.